Okay, good morning, everyone. We have six cases on today's argument calendar and we'll begin in Appeal No. 242573, Arriaga v. Thomas Dart, Sheriff of Cook County. Cooper, nice to see you. Yes, sir. Good morning, Judge Stoddard. Good morning, Judge Kolar. I've served about three minutes. I want to make some points that I think would enhance the briefing already done by my client. My client, ad nauseam, played hostile work environment. She did it under federal law and she did it under ICRA. ICRA is, in fact, more expansive as the Sagamon decision shows us. Second, my client lives in stealth. We know from the scientific literature and the expert retained by the plaintiff that living in stealth is a real phenomenon. And it is concerning that the district court found, not precisely as to living in stealth, but as to things tethered to living in stealth, that she was lying. And I can tell you that Officer Arriaga was not lying. She was living in stealth. She made clear that she interacted with other transgender people. In the brief, in the opening brief, I talk about Coptic Christians and how they would talk and interact with other Christians. In the slave era, we have slaves talking with one another in the evening, talking, that is practicing Christianity, teaching one another how to read and to write. That should not constitute perjury. That should not constitute a fraud upon the court because people maintain relationships with people who are like them. That's essentially what I have to say. Unless any of you have questions, I'm ready to answer. Are we able to get to the merits of this case, particularly the first substantive due process? Okay. Are we able to get to the merits? Yes, Your Honor, but I need more of a sense of what Your Honor is thinking and then I can certainly answer the question. Why is this not time-barred? Okay. In October of 2018, this is months after the police academy, she experiences yet another disclosure and it's still a hostile work environment, but it's two different cohorts of people. So if we want to restart the clock at October of 2020, tell me what happened. I'm sorry, I said 2018. I apologize. I know, either. So I'm sorry, say it again, please. Why is that a disclosure? Why are you characterizing that as a disclosure? Because the plaintiff testified it's a disclosure. We have Sergeant Keyes' email, although the defendants, both defendants interpret, when I say both defendants, Metro defendants, Cook County defendants, interpret the email in a way that I don't think is accurate. We have a new environment. Again, she's in the Metro station house. Prior to that, she's in the Cook County police academy. We don't want to get away from the legal analysis of why this was a disclosure. So let's talk me through why we're characterizing that as a disclosure. Okay, so she's in the police academy and then she goes to Sergeant Keyes and she says, people are talking about me. People are saying that I am trans. And on top of that, they're asking questions amongst themselves. Does she have testicles, male testicles? She describes crying. She describes being very upset when she goes to Sergeant Keyes. At that point, we hear that Mr. Perez tells Deputy Chief Riggio, take care of it. But even Perez admits he never follows up and Riggio never gets back to him. But I mean, that's another point. But the October 2018 disclosure was to Sergeant Keyes to Commander Mack. Right, it was Keyes. It started with Keyes. And he discloses that your client has come to him with a concern. I think you're referring to Sergeant Kammack. So that's over here. That's police academy. No, I'm talking over here with Metro Sergeant. Mr. Cooper, stay at the podium, please. We've had this happen. You don't have to apologize, but it's being audio recorded. Yeah, yeah. Okay, so it gets all messed up. I feel better apologizing. You don't have to apologize. Go ahead.  So the October 25, 2018 email, is that the one you're talking about? Correct, Sergeant Keyes. Okay, he's writing to Commander Ryan Mack. I agree. Okay, so what is the disclosure that restarts the clock? Arriaga goes to Keyes and she says, people are coming to me and they're saying that I'm trans. He even says to her, this is interesting, he says, I heard it too. He was never in the police academy. Keyes had nothing to do with police academy. So Keyes is hearing it for the first time in the Metro station house, miles away from the police academy. Then on top of that, she says to Keyes, this is what's happening. When I go into the locker room, they're talking about me. In fact, there's a second dissemination of a picture, another bathing suit picture. We just want to stick with October 25th. That's October. We're just trying to drill it down. That's October, Judge. When she complains in October, right, in my brief, I make clear. I describe the interaction with Sergeant Keyes, and then I explain why this interaction matters and why we're not timebarred. And I explain that she says that yet there's another bathing suit picture being circulated, this time in the Metro station house, not in the police academy. Maybe you don't understand my question, so let me try to rephrase it. One of the things that we have to kind of work through is when was even before we get to the continuing violation doctrine and whether or not that's applicable. You're making the representation that we should start at least the clock at October 25th, 2018. Correct. And so what I'm trying to elicit from you is what would have qualified that email that was sent to be a disclosure of medical information? Because she is now being told by people with whom she works that they believe she's trans, that they've heard that she's trans. So the argument is that there was a disclosure from Keyes? No, we don't know. Okay. But the disclosures in October are in the Metro station house. Those people were not at the police academy. There were a few who had a connection, like Sergeant Klima to his daughter. So first we have the disclosure. Then we have the hostile work environment in the Metro station house. So we have both occurring in the Metro station house. Mr. Cooper, you did say rebuttal time. Can I ask you one question? Oh, please.  What in the world is the explanation for your client leaving the Facebook group 45 minutes after the deposition ended? That's a huge problem. And I'm not going to deny that. That is a huge problem. The only thing that helps her just a little bit, because if I were in your position, I would have a bigger problem as a judge looking at that conduct. That was bad. That was wrong. However, Metro and Cook County always had that post. That post, now this is before I got involved in the case, and I'm not passing blame anyway. I'm simply saying that when I came into this case, I realized Metro already had the Facebook post. Yeah, I think what animates it, it's not to point out that it's bad. It's in connection with the district court. The district court was understandably quite concerned about that, but it was all connected with the answer that your client gave in the deposition. I mean, look, to your credit, in your brief, you say the plaintiff understands legitimate concerns about her response. I mean, the response is very problematic. Oh, yeah. I mean, problematic enough that the district court called it perjury, found it to be perjury. Judge, again, there's a conflation of post and text. For instance, and WhatsApp is the best example. Many people would define WhatsApp as social media. WhatsApp, in reality, isn't social media. It's simply the same texting you have through Verizon or T-Mobile, except that WhatsApp allows you to post updates. Arguably, that makes it somewhat of a post. How is any of that, though? I understand what you're saying, but how is any of that responsive to what's on appeal? I mean, the district court made a finding that your client made an intentional and knowing false statement in her deposition, and then the district court was equally troubled by what happened within an hour after the deposition ended. That's part of the debate. It's not all of it. I mean, the questions Judge Pryor was asking, you were part of it, too, but that's a pretty significant part of the dismissal that was the sanction. I agree. Where I think I can make a plausible argument that the case should be reversed is in connection with living in stealth. So Judge Kendall had concerns about many, many things that Officer Arriaga said. And among those things was that she kept her trans status private. And Mr. Goins, in his briefs, I don't know if he's here, makes clear, hey, you can't tell other trans people, you can't tell anyone. And what I'm saying is simply that's not realistic. She has to tell someone. There are people who knew she was trans in the beginning. And the way I see it, the district court hit her over the head because she said she's living in stealth. And the district court, unlike in the Grimes case, where the Grimes case basically said, yeah, living in stealth makes sense. But Judge Kendall's sense was, no, the science behind it is just not good enough where the court can recognize that that's a legitimate reason. Well, I think there's another. Judge Kendall, if memory serves, was also saying you can't have it both ways. You can't – it's one thing to say you're living in stealth, and it's another thing to be telling a lot of people that you're transgender. But shouldn't you be able to tell people within the group? That's why I use the example of the Coptic Christians, right? So they get together and they worship God. I'm sorry. I made reference to Jewish as well as Christianity. But we see throughout history people practicing Judaism or Christianity amongst themselves. And we see – again, I bring up slavery because there are people in the evening teaching each other how to read. Do they know who they are? If someone goes to alcohol, synonymous, right? And I'm not trying to – I understand your point. You saved actually 12 minutes for rebuttal.  And we've chipped into that a little bit. Well, you don't have to sit down. I just want to make you aware where you're at on the clock. All right. If Your Honor has another question, I'll stay. I have one more question that I just need clarity on before the other side gets up. Are you raising an equal protection claim? Your Honor, I would – I'm embarrassed. I would have to look at the complaint. My recollection is that there isn't one. There is not one? Yeah, that's my recollection. But, again, this case is sold. I've been preparing, but I just didn't run that through my brain. I think the answer is no. I mean, you can look – I shouldn't answer that. You should answer that. I'm looking right at the complaint. I don't think so. I just don't want to make any mistakes. But I do, in the brief, talk about substantial or substantive due process connected to bodily integrity. But the reality is there's no property interest. The Lanier case from 1997 sort of opened the door, but I'm not going in that direction.  Okay. This wasn't clear. I just don't ever want to say no when I'm in front of the Seventh Circuit and I'm wrong. That's part of being in the military. Judge Coldar would probably agree. All right. Let's hear from your adversary, and we'll call you back up. Okay. Very well. All right. Ms. Cain, nice to see you. May it please the Court. I'm Carolyn Cain, and I represent the Sheriff's Office defendants. In short, the district court judgment should be affirmed for three reasons. First, the conduct of the Sheriff's Office does not shock the conscience. Second, Arriaga's transgender status was not private medical information. And third, the Sheriff's Office was not deliberately indifferent. I want to start with our argument that the district court correctly found that the Sheriff's Office did not shock the conscience. Can we, can I, and I apologize for doing it, can I interrupt you at the beginning just to kind of level set the playing field? Sure. Do you agree that the complaint doesn't have a Title VII claim in it? Right. The complaint doesn't have an equal protection claim in it. The complaint has a state law claim in it, and it otherwise has claims in the name of the 14th Amendment substantive due process doctrine. Do you agree with that? I agree with that. Any other claims from your perspective? No. Okay. Was it ever litigated in the name of equal protection? No. It was litigated more in the note, at least as I took away from the briefs, that there's a fundamental right protected by the substantive due process doctrine to avoid a disclosure of private medical information. Here, transgender status. Correct. Is that correct? That is correct. So the first point I wanted to make is the conduct doesn't shock the conscience. There's no similar conduct here, similar to the cases cited by the district court judge. You're going to have to speak up for me a little bit. Speak up? Yes. Okay. I apologize. No, it's fine. There's no similar conduct here, analogous to the case law cited by the district court judge, to establish that the conduct of the sheriff's office shocked the conscience. Next, my point is that the court correctly granted summary judgment on Arriaga's Minnell claim. Arriaga's substantive due process claim was that the sheriff's office failed to establish a policy that would effectively forestall sexual harassment. It's undisputed that there was a policy the sheriff's office acted pursuant to that policy when they investigated Arriaga's complaint. And further, the evidence doesn't support that there was any widespread practice or that there was a sheriff's office official with final policy-making authority who either made a disclosure or participated in any alleged harassment. And on that point, the court also correctly found that Arriaga's claim against the individual defendants failed because they did not participate or contribute to any act of sexual harassment, nor were they inattentive to Arriaga's complaint. Next, I want to focus on the disclosure made by Sergeant Kamek, the only sheriff's office individual who made a disclosure in this case. This happened before the Academy started in April of 2018. Kamek held a staff meeting, which included six people, and he informed that team that there was a transgender recruit coming and that there were resources and facilities available. Arriaga's identity was disclosed at this meeting for the purpose of ensuring her safety and to make sure that the power test was administered in accordance with her gender identity. Kamek reiterated the confidentiality of this information, and this is undisputed. This limited disclosure is supported by a strong state interest, and therefore the sheriff's office defendants aren't liable under Section 1983. Should we move to the sanction? Sure. My colleague, Metro, is going to speak to the sanction. But there's nothing, I guess, in the policy. There's no policy that has been presented that was potentially violated by the sheriff's office. Correct. And one of my last points, Your Honor, is that the sheriff's office cannot and should be held liable for keeping this information private where Arriaga herself failed to do so. This is evidenced by Arriaga's social media activities and her own disclosures to her fellow recruits. She disclosed to her recruits as well as to some of the staff members as well. That's true, Your Honor. So she shared with numerous other people, some of which she did not know, and who had no obligation to keep this information confidential. I also want to quickly highlight that the district court was correct in finding that the claim against the sheriff's office was time-barred. Arriaga knew of the disclosures by June of 2018, and therefore her complaint filed over two years later was not timely. Lastly, on the district court's finding- Counsel from the other side, though, wants to restart the clock at October of 2018. How do we get around that? October of 2018 was after Arriaga had left the academy, which was in August of 2018. And just lastly, on the Civil Rights Act claim, the undisputed facts establish that the sheriff's office did not exclude her from participation in the program. She was accepted. She graduated from the academy and did well. Further, the sheriff's office did not deny her the benefits of the program or subject her to any form of discrimination. And lastly, the Civil Rights Act- It actually looked to me, I mean, maybe my impressions are wrong, it looked to me like she was performing as a successful officer the moment she walked out the door. That's true, Your Honor. And Civil Rights Act claims require showing of deliberate indifference. For the reasons I already touched on, the undisputed facts establish that the sheriff's office was not deliberately indifferent. If there are no additional questions for me, I just want to thank you for your consideration of our argument and for the reasons set forth in our brief. We respectfully ask this court to affirm the district court's summary judgment. Thank you. Thank you, Ms. Cain. Okay, Mr. Moore, nice to see you. You represent METRA, right? Yes, Your Honor. I represent METRA as well as the former chief of police, Joseph Perez. May it please the court, I intend to start with the sanctions issue unless you would like me to start with another topic. The district court did not abuse its discretion by dismissing plaintiff's entire case for perjury and other misconduct. Whether and to what extent plaintiff kept her trans status private was the central issue in the case. Plaintiff's complaint alleges that at all times she sought to keep her transgender status private. Plaintiff initially objected to producing any social media on the matter. At her deposition, she was asked, have you searched your Facebook and Instagram accounts for documents in this case? And she said no, which shows that social media was not produced before her deposition. She was also asked, prior to May of 2018, have you ever posted on your Facebook or your social media anything that would have disclosed her status as a trans woman? Plaintiff testified without qualification, no. The district court found this was perjury because after plaintiff's deposition, defendants discovered that plaintiff had in fact repeatedly disclosed her trans status online. For example, on April 10, 2018, one month before the Academy started, and the same day she disclosed her status to Metro Recruit Paige Visnevac, plaintiff posted in a Facebook group named My Trans Life, stating, quote, been in transition for four years now, just got accepted to the Academy, and included a photograph of herself. Plaintiff knew that the post could be copied and redistributed, and she had not produced it before her deposition. And we know plaintiff willfully misled defendants in the court because 45 minutes after her deposition, she went on to Facebook and removed herself from the group. So, counsel, assuming we're in agreement that that's problematic, maybe even that it rises to perjury, talk to me about the decision to take the ultimate step of dismissing the case, right? You do have to consider lesser sanctions, and is there enough of that consideration in the record? The district court judge was very thoughtful in her decision on sanctions. It was consistent with the law. It was supported by the facts, and it was clear that after months and months of trying to get the social media, then taking a deposition, then having to file motions to compel, plaintiff was trying to hide something that went to the core of the case. And when anything goes to the core of the case, and you commit perjury on it, you have given up your right to litigate the claim. Now, if this court agrees that the district court did not abuse her discretion in sanctioning plaintiff, it can affirm for this reason alone. Now, turning to the disclosure claim, the record establishes a single disclosure by METRA. That's when METRA sent the medical authorization form that said it was safe for plaintiffs to take the power test, the physical agility test, to the academy in that form, completed by a doctor, disclosed her trans status. There's no evidence in the record that Chief Perez or Deputy Chief Reggio disclosed plaintiff's trans status to anyone. And because of that, excuse me, before I get to that, plaintiff speculates a lot about who may have said what, but there's no evidence that Perez or Reggio told anyone. And so when we're looking at the single disclosure, plaintiff consented to it by signing the consent form. She agrees in her brief at page 32 that sharing the form for purposes of the power test was a legitimate government purpose. And for all the reasons that we've discussed, plaintiff didn't keep her trans status private, given her online disclosures and disclosures to recruits. Now, in terms of the alleged October 2018 disclosure, there was no such disclosure. At that time, plaintiff did raise a complaint. But what's key to a Monell claim is that the person who made the disclosure has to be acting under the colour of state law. They allege that that was Perez. We disagree that he was acting under colour of state law. And there's no evidence that he disclosed it to anyone. It's just second-hand rumours about people who were not acting under colour of state law under the Monell analysis. Additionally, when you look at the claims against Chief Perez in his individual capacity, they have to show that he personally participated, and they have not. Then switching to the substantive... So you don't think there's any traction with the notion that there were already rumours that Perez says, basically, when he comes in, there are rumours going around. Everybody knows. That's not a disclosure? That's not a disclosure. That would go to a hostile work environment claim that was not pled. Your Honours are correct that there was no equal protection clause that wasn't raised in the complaint. It wasn't briefed at summary judgment. They don't cite cases in their appellate court briefs on that topic. And even if they did, there can't be employer liability for co-worker harassment if the employer took reasonable steps in response, which they did. So think about what happens in October. October 5th, before the alleged October disclosure, October 5th, Deputy Chief Reggio reaches out to plaintiffs and asks, how's training going? Because he did know things had happened at the academy. She said, everything is great. October 25th is when she reported the second-hand claims. Perez and Reggio try to meet with her immediately on October 30th, and she cancels the meeting. Then Perez emails her on November 1st, the next day, and says, we need to meet. I need specifics so we can investigate. He also reaches out to Metro's EEO department to make sure that there's anti-trans harassment training. Then on November 16th, when plaintiff finally meets with Reggio and Perez, she refuses to identify specific perpetrators. Then next, on December 17th, Reggio follows up with her again and asks her, how's everything going? She writes back, quote, everything has been going good. I honestly haven't heard anything lately. I appreciate you checking in. She never reported any additional concerns to Reggio, Perez, or Metro's EEO office. In fact, 9 months later, in September, she posted on Facebook that working at Metro is, quote, awesome. Mr. Moore, you can wind down. Why don't you leave us with a concluding thought, and we'll go back to Mr. Cooper. Just very quickly, on the Illinois Civil Rights Act claim, Your Honor, the court correctly found that Metro's responses were reasonable under that law. Plaintiff's new argument raised only in the reply brief about Sangamon County Sheriff's Office versus the Illinois Human Rights Commission and strict liability was waived. In her summary judgment brief and in her opening appellate brief, she says that under the Illinois Civil Rights Act, the inquiry is, among others, whether reasonable care or steps were taken by the employer. They've waived that argument, and it's incorrect. If you have no other questions, thank you for your time. Mr. Moore, thanks to you. Mr. Cooper, you have a... I'll go fast. We didn't waive the argument. We argued that the Illinois Civil Rights Act does what Title VII does. It carries us to the last day of the academy, which was on or about August 27, 2018. So there was conduct right through the last day of the academy that we appeared 42 times... 42 times... 42 times in our complaint that she was subjected to a hostile work environment. Yeah, it is. I'll just say that it's a bit of a misfit. We just don't see it very often. I can say that with 100% confidence. This substantive due process doctrine being used to press a hostile work environment claim. We see a lot with the employment discrimination statutes. It was never the intent to go that route. Otherwise, the whole point of the ICHRA... I don't know how you can say that. It's all over the complaint. Because you have the Illinois civil rights count all by itself. So going back to your first question, if we didn't have a disclosure in October, we still had the hostile work environment. Where is the hostile work environment claim? I asked you, what are the claims you've raised? So she describes... I used one example of the locker room. I'd have to go through the brief to give more examples. But I lay out in the brief everything that she says happened after July 20th. And I think I thought I did a good job of doing that. So I'm saying if we don't have disclosure, we still have hostile work environment. I'm also saying, Judge Scudder, that the ICHRA claim, that is a hostile work environment claim, as well as a whole lot of everything else. It's far more expansive than Title VII. Am I out of time? Yeah, we understand your position. We appreciate it. Was there one final quick thought you want to get out? She communicated in private groups with other transgender people. These sites were not open to the public. These are the social media communications. They were among other transgender people communicating with each other. Thank you, everyone. I appreciate it. Okay. Mr. Cooper, thanks to you. Ms. Cain, Mr. Moore, your colleague as well, will take the appeal under advisement.